ORMAN *v.* BRANSFORD REALTY Co. *et al.*

(*Jackson,* April Term, 1934.)

Opinion filed July 14, 1934.

72

W. P. Cooper and W. Howard Ewing, both of Nashville, for appellant.

Lee Douglas, W. E. Norvell, Jr., and Laurence B. Howard, all of Nashville, for appellees.

Mr. Justice Chambliss, delivered the opinion of the Court.

The complainant holds twenty shares of preferred stock of defendant Bransford Realty Company, out of a total capital stock of $1,500,000, of which $1,000,000 is preferred. Being dissatisfied with the management of the corporate affairs, she brings this suit, praying for the court to take over and wind up the corporation through a receiver; that her bill be declared a general stockholders' bill for the benefit of all stockholders alike; and for an incidental accounting, etc. She made defendants the realty company and two corporations, Tennessee Valley Securities Company and Bransford & Co., alleged to have subsidiary or interlocking relationships with the realty company, and having identical officers. No direct relief appears to be prayed for against the latter two corporations.

The bill, as finally passed on by the chancellor, is made up of (1) an original bill; (2) an amendment incorporated in a decree allowing it; and (3) an amended and supplemental bill. Demurrers were filed, made applicable by appropriate orders to the bill as finally considered, and answers were also filed. The chancellor sustained the demurrers and dismissed the suit. Complainant appeals.

The Bransford Realty Company is a Tennessee cor-

poration, chartered in 1906, to do a real estate business. The securities company and Bransford & Co. were organized in 1923; the first to deal in notes and securities, the second to act as an insurance agency. Both were apparently formed to operate in association with the realty company; one to deal in securities in a manner not strictly within the corporate powers of the realty company, and the other primarily to handle fire insurance on the extensive holdings of the realty company.

The bill charges that widespread dissatisfaction and disagreement exists among the stockholders touching the management of the realty company, but the record fails to show who these are; none have been made parties, the complainant alone appearing or complaining.

Solvency is admitted by the bill, and very large assets are shown. Dividends were consistently paid until 1931, and statements exhibited show the company has a large surplus.

██ The principal complaint directed at the two affiliates, stressed in the amendment, is that they are operated in harmful competition with the realty company, doing profitable business that company might do, but this charge appears to be inconsistent with the allegations of the original bill that (1) the dealing in securities, etc., was beyond the powers of the realty company, and (2) that the realty company was in general process of liquidation, therefore not seeking new business, and, further, specifically that the realty company was without cash resources and could not obtain funds. We are of opinion that the demurrers of these two defendants were properly sustained on grounds, among others urged, that (1) no relief was prayed against them; (2) that the charges were inconsistent as above shown. Misconduct

was also charged in that one of these companies had purchased from time to time large blocks of the preferred stock of the realty company, but this was not an acquisition of assets of the realty company, and afforded no ground of complaint by this stockholder. Some general charges are also made, to the effect that funds or assets of the realty company had been in some manner or degree diverted to these companies, but complainant appears to admit her inability to make these charges definite or specific.

Coming now to a consideration of the charges of the bill showing ground for the taking over from its officers and directors the management of the company and winding up its affairs by a receivership, a careful analysis of the allegations reduces the voluminous charges to the following summary:

It is alleged that the defendant shows a loss in operations in 1931 and 1932, and will show a further loss in 1933. It owes much borrowed money and has pledged large assets to secure it, and it can no longer obtain money for the prosecution of its business. Under these conditions its managing officers are proceeding to liqui- date, or wind it up, which, because of the frozen nature of much of the assets, consisting of real estate and obligations based thereon, in these times hard to realize on, cannot be done quickly. It is charged that its balance sheet shows notes receivable of $1,481,689.02, three-fourths pledged; that it owes for borrowed money $1,- 245,515.00, and has real estate holdings carried at $1,144,- 814.84. In general terms it is charged that some contingent liabilities exist growing out of sales of property on which underlying liens existed, but no details or specific facts are shown. Reference has already been made

to dealing by the securities company and Bransford & Company in the preferred stock of the realty company. It is complained that the rent being paid is too high and that the officers' salaries are too high. The rent is said to be $575 a month, and three officers receive, respectively, $562.50, $270, and $202.50 per month. However, the bill frankly shows that these salaries were formerly very much higher, and had been reduced by the management voluntarily as of April 1, 1933. (This suit was brought September 19, 1933.)

In paragraph 9 of the original bill, it is shown that for 1932 salaries aggregated $31,359.90; that profit from sales was $24,949.31 and interest collected $56,946.12, while interest paid out was $81,179.60. It is charged that this liquidating cost was too high, but it was shown to have been greatly reduced before the filing of the bill. The opinion is expressed that these operating expenses could be greatly reduced by court direction through a receiver.

In paragraph 10 it is charged that these elements of excessive cost constitute waste which the court will restrain, and it is charged that the corporation is "amply solvent," and, if prudently administered, the stockholders will receive large returns. In a preceding paragraph, in general terms, it had been charged that the company had gone into Florida and other states in its dealings, a territory in which it was not qualified to do business, and suffered large losses in so doing, but complainant says she is not informed as to the details or extent of such *ultra vires* dealings. Finally, it is charged that its corporate functions cannot longer be discharged; that a complete audit is necessary, which she believes would show liability on the part of officers of the company, par-

ticularly because of the dealings in foreign states, but no names, details, facts, or figures are given. The prayer was (1) for process, (2) for a receiver, and (3) that the bill be declared a "general stockholders' bill."

By the amendment incorporated in a court order the competition hereinbefore referred to is more specifically charged, in that the securities company and Bransford & Co. do business in the same office with the realty company, and earn profits in dealing in securities, mortgage notes, etc., which ought to go to realty company, but these allegations appear to us to be inconsistent, as already suggested, with the charge that realty company might not lawfully do this character of business, also that realty company was without available funds, and also was in process of liquidation. We are unable to see that the realty company is being discriminated against or injured thereby. This amendment prays for an accounting by which it may be developed that stock of these two companies had been contributed to by realty company, but no facts are set forth. An injunction is prayed for against these alleged competitive dealings.

Summarizing the amended and supplemental bill, it appears to be charged:

(1) That in previous years funds had been illegally invested outside of Tennessee; this being *ultra vires* as well as improvident. Investments in farm lands, etc., are set out, and it is said these have been handled at a loss. It is not shown that any of these investments have been made in recent years, and the mere fact that they are not now profitable does not, without more, establish improper present management.

(2) That legal titles have been taken and held in some cases in the names of individuals, but it is not

shown that this was fraudulently done, or that, in fact, the corporation has suffered loss thereby. It must be conceded that, for various reasons, such a course is frequently followed for convenience in handling corporate. properties.

That in the year 1930, three years before the bringing of this suit, large .expenditures were made for advertising, automobiles, commissions, and salaries.

That complainant has demanded and been refused the right to check the books of the corporation, but she concedes that she is advised that her remedy is mandamus, and declares her purpose so to proceed. She admits inability to make more specific charges of mismanagement because of lack of access to the. books and files.

The appointment of a receiver is a proceeding in the nature of extraordinary process ancillary to a pending suit. The right to the appointment here must follow upon the establishment of the right to maintain a suit by this stockholder to wind up in equity the defendant corporation. The substance of the chancellor's holding is that the complainant has failed to show reasons for the taking over by the court of the winding up of the defendant.

Mr. Gibson (paragraph 898, Suits in Chancery) says, "A receiver will be put in charge of the property, assets and franchises of a corporation, on application of a creditor or stockholder: 1, when it becomes insolvent; or, 2, when its franchises are not used, or have been granted to others, in whole or in part; or, 3, when its choses in action have been levied on."

Neither the first nor third of these conditions appear

here. Does the second have application? Mr. Gibson cites, to support this rule, Code, sec. 4294 et seq. (1932 Code, secs. 10364 and 10365), reading as follows:

"10364 6103 (4294). *To subject corporation property.*—The creditors of a corporation may also, without first having obtained a judgment at law, file a bill in the court of chancery, to attach the property of the corporation, and subject the same, by sale or otherwise, to the satisfaction of their debts, when the corporate franchises are not used, or have been granted to others in whole or in part.

"10365 6104 (4295). *Receiver.*—In such cases the court may appoint a receiver, take an account of the affairs of the corporation, and apply the property and effects to the payment of debts *pro rata*, and divide the surplus, if any, among the stockholders."

It will be observed that this statute authorizes *creditors* to *attach* the corporate property and subject it to *their debts*, "when the corporate franchises are not used, or have been granted to others in whole or in part." It is obvious that we must look further for the authority of a stockholder to maintain a suit to wind up the corporation.

The foregoing sections originated in the Acts of 1851-52, chapter 172. Section 3431 of the Code of 1858 (section 9358 of the Code of 1932), originating in the same Act of 1851-52, is as follows:

"9358 5187 (3431). *Corporation not dissolved by nonuse, etc.*—A corporation is not dissolved by the nonuse or assignment to others, in whole or in part, of its powers, franchises, and privileges, unless all the corporate property has been appropriated to the payment of its debts; and any creditor, for himself and other creditors, whether

he has recovered judgment or not, or any stockholder for himself and other stockholders, may file a bill under the provisions of this chapter, to attach the corporate property, and have such property applied to the payment of the debts of the corporation, and any surplus divided among the stockholders.''

This section relates to a case of nonuser or assignment of its powers and franchises by a corporation owning property undisposed of, and authorizes a creditor *or stockholder* to file a bill and *attach* the corporate property and have it applied to debts and the balance distributed among its stockholders; in other words, to wind it up when nonuse or assignment of its corporate powers is shown. This statute was applied in *O'Connor* v. *Knoxville Hotel Co.*, 93 Tenn., 708, 28 S. W., 308, quoted from and relied on for appellant. Mr. Gibson treats this statute as having application to a case of insolvency, and insolvency did appear in the Knoxville Hotel Case, *supra.*

We think it should be conceded, however, that both by virtue of this statute and the power inherent in chancery, if a corporation, although solvent, has ceased to function under its charter, a stockholder might maintain a suit to impound and distribute corporate assets. This right applies to a case of nonuser.

Now in a case of misuser, that is, where a corporation acts beyond its charter powers or exercises powers not conferred by law, another statute provides the remedy, an action in the name of the state, in the nature of *quo warranto* (section 9336, Code of 1932) most recently recognized in *State* v. *Retail Credit Association*, 163 Tenn., 450, 43 S. W. (2d), 918. In such a situation, this remedy appears to be exclusive as a substitute for com-

mon-law remedies, *Hooper* v. *Rhea*, 3 Shan. Cas., 145, and the state is a necessary party, *State* v. *Red River Turn-pike Co.*, 112 Tenn., 615, 79 S. W., 798.

It certainly cannot be concluded that the bill before us states a case of nonuser of corporate functions. At most, it alleges a gradual process of liquidation, a functioning for this legitimate purpose, and an incidental operation for purposes of profit. Nonuser or abandonment of corporate functions may not be deduced from the adoption of a policy looking to a gradual liquidation of its affairs. Conditions frequently arise in a solvent business when its owners find it best to adopt a policy of liquidation. This is not nonuser, but legitimately continued active user of its functions essential to orderly liquidation, realization upon, and distribution of its assets. This bill cannot be maintained on this theory.

Court intervention appears to be invoked on three other general grounds, as we read the bill, (1) that the management is extravagant and wasteful; (2) that *ultra vires* acts have been committed to the detriment of the corporation, (a) in the making of certain investments beyond our state lines, and (b) in the placing of certain titles in the names of individuals; and (3) that an investigation which would incidentally be made under court control would reveal individual liability to the corporation on the part of some of the officers.

With respect to the last of these complaints, it must be said that the charges are too vague and indefinite for recognition. No names are given, and no specific acts are shown. Learned counsel practically concede this, saying that a search of the books is necessary to develop the facts, and, this inspection being denied to

them, a purpose is declared to pursue the remedy of mandamus.

Passing next to the second head, alleged *ultra vires* acts, it appears that these extra-territorial investments were made years ago. There is no showing that this course of conduct is now being followed. No charge is made that such are now contemplated, planned, or threatened. All that is being done now in this connection is apparently being done to preserve and save for the corporation these assets or investments. Certainly, whether originally unlawfully or improvidently made, it would seem to be the duty of the management to hold and gather in and save these investments. The charge of illegality touching these investments outside of this state rests on the theory that the corporation in making them was ''doing business'' in foreign states without qualifying therein. The mere purchase of lands by a corporation within a foreign state is not generally held to be a doing of business in the given state, in the sense of the statutes requiring qualification. Certainly the corporation which has made such investments should not voluntarily abandon their holdings, but should follow up and conserve them. It is likewise true of cases in which titles have been placed or held in nominees, in trust, that the rights of the corporation should be affirmed and the properties or their proceeds realized on. If it should appear upon investigation of the records of the company that its officers have illegally made such investments and incurred losses, the remedy is by appropriate action against them. If such practices were shown to be now being or about to be followed, the remedy of injunction is open, but, as stated, this is not charged.

This brings us to the remaining ground relied on for intervention by the court in the winding up of the defendant corporation; that is, as first above stated, that the management is extravagant and wasteful.

The bill in this cause is notable in its omission of direct charges of *fraudulent* or even of *willful* mismanagement or misconduct on the part of its officers. Boiled down, the charges amount to little more than charges of bad judgment, and consequent extravagance and waste. The discretion of the chancellor was directly invoked.

As before suggested, the question passed on by the chancellor was whether or not a case was stated requiring the court to take over from its officers and stockholders the winding up of this private corporation's business and conduct its liquidation through a receiver. The *prima facie* right is, of course, in a corporation to conduct and wind up its affairs. Courts are not constituted primarily for such purposes. The power is conferred on them to intervene only when necessary for the protection (1) of creditors and (2) of minority holders. This drastic step should be taken only when the call to the court is clear. The right of the majority to rule in the direction of corporate business should be recognized, unless illegally or corruptly exercised. Mere differences of judgment touching details of internal management do not justify court interference and domination at the instance of dissatisfied minorities.

The general rule is thus very well stated in 53 C. J., pp. 32-34:

"The power to appoint a receiver is a delicate one which is jealously safeguarded, and reluctantly exercised, by the court. The power should be exercised sparingly,

with caution and circumspection, and only in an extreme case, under extraordinary circumstances, or under such circumstances as demand or require summary relief. Also a receiver should be appointed only in a clear case, and never in a doubtful case or where there is no necessity or occasion for the appointment.''

Learned counsel rely strongly on *O'Connor* v. *Knoxville Hotel Co.*, *supra*, but this case is clearly to be distinguished. The bill was brought primarily to secure the very thing the bill here concedes is under way, namely, the winding up or liquidation of the corporate affairs. The body of the opinion deals with this question. Here we have only the question whether the winding up, necessarily gradual, of this very large business, shall be done by its owners or by the court. We are not convinced that the learned chancellor failed to use sound discretion.

1. It is significant, as a practical proposition, that, out of holdings of $1,500,000 in capital stock, but one holder of only $2,000 should be making this demand. Conceding her technical right to come here alone, the situation is not persuasive that the demand for court intervention is urgent. Presumably the vast majority of the stockholders, the officers, and directors are content.

2. The record shows years of profit in years of plenty —on the whole an unusually competent and satisfactory management. That losses have occurred in the recent years of world-wide financial distress and disaster is not suggestive of bad or incompetent management. That the company remains ''amply solvent'' is creditable.

3. The items of expense set out and relied on are not necessarily unwarranted when the nature, great size, and scope of this business is considered. Moreover, it is

worthy of note that the management has voluntarily made large reductions in these items.

4. Complainant fails to show that she protested by vote of her stock against the election of the officers now in control, and, while opinion is expressed that certain expenses of management are high, no showing is made that competent management could be had at less expense. No presumption applies that liquidation by and through court proceedings is conducive to economical results. On the contrary, the presumption is that the displacement of men experienced in a certain line of business and with knowledge of details of the business, and substitution of those new to it, would be hurtful, rather than otherwise.

5. Moreover, as already suggested, a remedy is open to complainant to compel an opportunity to examine the books and records of the company, and, if ground therefor is disclosed, recourse may be had to the courts to right any specific wrongs that may be disclosed and to recover from those responsible therefor such funds of the corporation as may be found to have been wrongfully diverted or appropriated.

On the whole case, after a most painstaking review of the record, we find no error in the action of the chancellor, and his decree is affirmed.